## MERRITT–CHAPMAN & SCOTT CORP. v. NEW YORK TRUST CO.

### No. 71, Docket 21781.

United States Court of Appeals Second Circuit.

Argued Oct. 4, 1950.

Decided Nov. 8, 1950.

Clark, Circuit Judge, dissented.

White & Case, New York City (Joseph M. Hartfield, Jesse E. Waid and Edward J. Kenn, all of New York City, of counsel), for defendant-appellant.

Booth & Baron, New York City (George C. Baron and Frederick Doppelt, New York City, of counsel), for intervenor-appellant.

Manning, Harnisch, Hollinger, Quinnan & Shea, New York City (John J. Manning, William Hughes Mulligan and Edwin A. Lewis, all of New York City, of counsel), for appellee.

Before LEARNED HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This litigation involves the rights of holders of stock purchase warrants issued by Merritt-Chapman & Scott Corporation pursuant to a trust deed made with The New York Trust Company as trustee under date of December 1, 1928, with respect to a stock dividend declared by the corporation on July 12, 1950. The case is before us upon appeal from a summary judgment in a declaratory judgment action.[1] Federal jurisdiction rests on diversity of citizenship. The issue decided below and now presented on appeal turns on the proper interpretation to be given to certain provisions, hereafter to be set forth, of the trust deed.

There is no dispute as to the facts. The warrants were issued in 1928 in bearer form. Each warrant certifies that subject to the provisions of the trust deed "and subject to the provisions hereof, for value received, the bearer hereof is entitled to purchase * * * full-paid and non-assessable shares of common stock of the Corporation, without par value, as it may exist at the time of such purchase, at any time or from time to time hereafter at the price of Thirty dollars ($30.) per share, upon surrender of this Warrant," at the office of The New York Trust Company, "accompanied by payment of the purchase price." Upon certain contingencies specified in the trust deed the so-called "basic purchase price" of $30 per share was subject to downward revision. To insure that stock purchasable under the warrants would be available, the trust deed required that stock certificates for an aggregate amount of 40,000 shares be delivered to the trustee and made the Trust Company the agent of the corporation to receive the purchase price and to deliver the stock certifi-

956

cates upon exercise of the warrants. The deed further provided that stock certificates deposited with the trustee "shall not be deemed legally issued or outstanding until so delivered by the Trustee. The Corporation will, however, at all times during the life of such Warrants, retain a number of authorized, but unissued, shares of the common stock of the Corporation represented by the stock certificates and stock scrip certificates (if any) then on deposit with the Trustee, and/or which the Corporation may be required to deposit with the Trustee as hereinafter provided."[2] The final clause above quoted refers to section 7 of Article III, which is quoted in the margin.[3]

On July 12, 1950, by resolution of its directors, the corporation declared a stock dividend in the amount of 40% per share of no par common stock "on each legally issued and outstanding share of said common stock in the hands of the public," such dividend "to be payable on October 16, 1950 from authorized but unissued shares to holders of such common stock as of the close of business on September 15, 1950." The resolution fixed the price for the shares of stock issued as a dividend at $20.00 per share, and directed the treasurer of the corporation upon the issuance of the certificates representing such dividend shares to transfer from the Earned Surplus Account to the Common Capital Stock Account the sum of $20.00 for each dividend share. The resolution also directed the proper officers to give to warrant holders outstanding under the trust deed and to The New York Trust Company as trustee the 60 day notice required by section 10 of Article III, in case the Corporation "shall pay any stock dividend upon the outstanding common stock" or take other specified action which may affect the value of the stock purchase warrants.[4]

2. Section 3 of Article III of the trust deed.

3. "Section 7. As long as the Warrants shall remain valid and outstanding, the Corporation will not pay any dividends on its common stock payable in stock of any class (such dividend being herein sometimes called 'stock dividend'), unless the Corporation shall deposit in trust with the Trustee stock certificates of the character above described in Section 3 of this Article III representing an amount of stock (of whatever class) of the Corporation equal to the amount of such stock dividend, if the same had been declared upon the common stock represented by the stock certificates then held in trust by the Trustee hereunder, and the Trustee shall, out of such additional stock certificates so deposited in trust with it on account of such stock dividend, upon the exercise of Warrants, deliver in the manner herein provided, with any shares of common stock purchased thereunder, but without additional consideration therefor, such number of shares as may be equal to such stock dividend, if the same had been declared upon the common stock so purchased; and as provided in Section 5 of this Article III, the Corporation will from time to time issue and deliver to the Trustee such stock scrip certificates as may be required from time to time to enable the Trustee upon the exercise of Warrants to make any and all deliveries in respect of any such stock dividend.

"If the Corporation deposits stock certificates as in the foregoing paragraph of this Section 7 provided, the stock issued by way of a stock dividend shall not be considered as outstanding for the purpose of any adjustments in the price at which shares of stock may be purchased under the Warrants as provided in this Indenture."

4. "Section 10. In case
"(a) the Corporation shall pay any stock dividend upon any outstanding common stock, or make any distribution other than a cash dividend to the holders of its common stock; or
"(b) the Corporation shall offer for subscription to the holders of its stock (of any class) any additional common stock or any stock (of any class) of the Corporation or any other securities; or
"(c) of any capital reorganization or reclassification of the capital stock of the Corporation; or
"(d) of the consolidation or merger of the Corporation with another corporation; or
"(e) of the dissolution, liquidation or winding up of the Corporation or sale of all or substantially all of its assets (whether voluntary or involuntary);
"then in any one or more of said cases, the Corporation shall give to the Trustee and to the holders of the Warrants outstanding hereunder at least sixty days' prior written notice of the date on which (aa) the books of the Corporation shall

Following the declaration of the stock dividend a controversy arose between the corporation and the trustee with respect to the rights of warrant holders. The corporation contends that a warrant holder must exercise his warrant before September 15, 1950 in order to share in the dividend. The trustee contends that the corporation must deposit with the trustee stock certificates in an amount equal to 40% of the certificates now on deposit with the trustee, and that whenever a warrant holder may elect to exercise his warrant, he will be entitled to receive 1.4 shares upon paying the "basic purchase price" for one share. To resolve this dispute the present action was brought, and each party moved for summary judgment on the complaint and answer. Without opinion, the district court gave judgment for the plaintiff corporation.

█ The appellants contend that in so doing the court disregarded the terms of section 7 of Article III, set forth in note 3, *supra*. We think their position is well taken. The warrants gave the holders thereof the privilege, unlimited in time, to purchase an aggregate of 40,000 authorized but unissued shares. In 1928 when the warrants were issued, a definite number of the company's common shares were then outstanding. Had the warrant holders forthwith exercised their option to purchase, they would have acquired a definite

percentage of the common stock. A stock dividend does not change the proportional interest of each shareholder in the corporate enterprise; it changes only the evidence which represents that interest. It is a mere "watering" of outstanding shares.[5] If the corporation were at liberty to declare stock dividends without making provision for warrant holders, the percentage of interest in the common-stock capital of the corporate enterprise which the warrant holders would acquire, if they thereafter purchased the shares subject to warrants, could be reduced practically to the point of extinction. Of course part of the injustice could be avoided by reducing the price to be paid for each share purchased under the warrants, but the privilege the warrant holders originally had of acquiring a definite proportional interest in the common stock capital of the corporate enterprise would be lost without recourse unless their contract with the corporation contained some provision to protect it.[6] The purpose of section 7 was to supply such protection. It is a covenant by the corporation.[7]

By this covenant the corporation recognized the possibility that a stock dividend might be declared and paid on outstanding shares before the warrants had been exercised, and promised in that event to deposit with the trustee stock certificates representing that

---

close for such stock dividend, distribution or subscription rights, or (bb) such reclassification, reorganization, consolidation, merger, dissolution, liquidation, winding up or sale shall take place, as the case may be, and such notice shall also specify the date as of which stockholders of record shall be entitled to participate in such dividend, distribution or subscription rights, or to exchange their shares of stock for other stock of the Corporation, pursuant to such reclassification or reorganization or for stock of the corporation resulting from such consolidation, or to receive their respective distributive shares in the event of such dissolution, liquidation, winding up or sale, as the case may be; to the end that, during such period of sixty days, the holders of Warrants outstanding hereunder may purchase stock in accordance with such Warrants and be entitled in respect of shares so purchased to all of

the rights of the other holders of similar stock of the Corporation. The notice herein required to be given to the holders of the Warrants shall be sufficiently given if the Corporation shall publish such notice on at least three different days (during said period of sixty days) in a daily newspaper of general circulation printed in the English language in the Borough of Manhattan, The City and State of New York, and shall also mail a copy of such notice to the Trustee."

5. See *Eisner v. Macomber*, 252 U.S. 189, 202–203, 40 S.Ct. 189, 64 L.Ed. 521.

6. See Berle, Convertible Bonds and Stock Purchase Warrants, 36 Yale L.J. 649, 656–7.

7. Article III opens with the sentence: "The Corporation covenants and agrees as hereinafter in this Article III set forth:"

proportion of the dividend shares which the shares subject to the warrants bore to all the common shares, and that the trustee would deliver such dividend shares "without additional consideration," together with the purchasable shares, when the warrant holder pays for the latter. There is no suggestion in the language of section 7 to set any limit on the time when the warrant holders must exercise their unlimited option to purchase common shares.

The appellee points to section 10, set forth in note 4, supra, as setting such a limit. That section also is a covenant. By it the corporation merely promised to give the warrant holders and the trustee a sixty day notice "in case the Corporation shall pay any stock dividend"—or take other specified action—"to the end that, during such period of sixty days, the holders of Warrants outstanding hereunder may purchase stock in accordance with such Warrants and be entitled in respect to shares so purchased to all the rights of other holders of similar stock of the Corporation." Other holders of common stock will receive distribution of dividend shares if they were stockholders on the record date. The notice tells warrant holders that if they exercise their warrants by the record date they will have the rights of stockholders, i. e., the right to receive the stock dividend shares on the date when the dividend is payable. But the warrant holders are not claiming that right; what they are insisting upon are the rights promised by section 7. The appellee must, and does, contend that the notice provision is for the purpose of giving the warrant holders notice that unless they exercise their warrants by the record date, they will forfeit those promised

rights. Certainly the language of section 10 is not aptly chosen to express such a forfeiture; and the argument that it was not so intended gains added force from the fact that sections 8 and 9 of Article III expressly provide for forfeiture under circumstances where that is the intended result. Construed as appellants urge, section 10 would cover them on these occasions and sections 8 and 9 would become mere surplusage.

It is suggested that the meaning the appellants ascribe to section 7 is inconsistent with the face of the warrants, which limits the holder to the stated number of shares of common stock "as it may exist at the time of such purchase," and indicates an intent to confer on the holder only the right to buy on an "as is" basis. But so construed the warrant provision contradicts section 7 and 8, which contemplate changes resulting from stock dividends, recapitalization, merger, etc. It is more consistent to read the quoted words as referring to such possible changes. That is to say, one share may, by reason of a stock dividend, mean 1.4 shares of stock "as it may exist at the time of the purchase."

Finally, it is urged that section 6 of Article III provides for a reduction in the basic purchase price in case of a stock dividend.[8] Concededly it contains no express reference to stock dividends. The argument is that a stock dividend is covered by clause (b) which provides for a reduction in the basic purchase price if shares are "issued for a consideration, other than money, valued by the Board of Directors at the time of the acquisition thereof, at a net amount less than the basic price of the common stock of the Corporation at the

---

8. "Section 6. The basic purchase price at which the holders of the Warrants may purchase common stock of the Corporation as set forth in Section 2 of this Article III shall be subject to reduction and adjustment from time to time in the following manner:

"(1) If at any time or from time to time after December 1, 1928, shares of common stock of the Corporation, without par value, be issued to a number in excess of 264,000 shares, as such shares may from time to time be constituted, and (a) sold by the Corporation

for cash at a price per share which is less than the basic purchase price thereof at the time in effect or (b) issued for a consideration, other than money, valued by the Board of Directors at the time of the acquisition thereof, at a net amount less than the basic purchase price of the common stock of the Corporation at the time in effect, the said basic purchase price shall be adjusted as follows, provided, however, that in no event shall the adjusted price exceed at any time the basic purchase price:"

time in effect." These words are certainly not apt language to denote a transfer on the company's books from the Surplus Account to the Capital Stock Account. Moreover, to ascribe such a meaning to them entirely contradicts the final paragraph of section 7 quoted in note 3, supra.

■ For the foregoing reasons we conclude that the court erred in not accepting the appellants' interpretation of the warrant holder's contract. At the argument it was agreed that if the corporation were not stayed from distributing the dividend shares to stockholders of record on October 16, 1950, it would, in case of reversal of the judgment, deposit with the trustee certificates representing dividend shares for the warrant holders and permit any warrant holder who may have exercised his warrant on or before the record date, in reliance on the judgment below, to rescind the transaction, if he so elects promptly after notice of reversal of the judgment, and be reinstated as a warrant holder. Our mandate will direct that this agreement be carried out.

Judgment reversed and case remanded with directions to enter judgment in accordance with the foregoing opinion.

CLARK, Circuit Judge (dissenting).

Since this is a complicated agreement where diverse contentions are possible and since my views are not to prevail, I shall only indicate them without extensive development. What chiefly persuades me to the contrary conclusion is that the definite time provision of sixty days for exchanging warrants, "in case the corporation shall pay any stock dividend," of sec. 10, Art. III, is now left without rational purpose or function. I expect, however, that this is one of those cases sufficiently disputable so that the approach one initially makes to the problem actually points the way to the final solution. If I thought a stock warrant should be normally approached as an eternal and untouchable privilege, I, too, I expect, would regard sec. 7 as so declaring and hence find that sec. 10 could not be given force according to its wording without working a "forfeiture" of or declaring "forfeit" what

had already been given. But since I think it not at all unusual for the draftsmen of such an agreement to wish to put some limitations upon those rights, to limit the extent to which they can allow the holders to be over, but not a part of, the corporate organization, I find the other construction to be more natural and to have the advantage of according some appropriate function to every section of the agreement.

Thus secs. 8 and 9 apply to the particular situations they expressly cover and do not apply to the situation covered in sec. 10, and there is no surplusage. The provision of sec. 6 for reducing the basic purchase price of the stock seems, to my mind, rather clearly applicable in case of a stock dividend and be a reasonably fair counteradjustment to those warrant holders who still wish to stay on the outside awaiting developments. And sec. 7 carries its own statement of its application conditioned "if the same had been declared upon the common stock represented by the stock certificates then held in trust by the Trustee hereunder" or later "if the same had been declared upon the common stock so purchased." True, this gives the corporation power to determine whether the stock dividend be upon only the active stock or also upon this block already frozen in the hands of the Trustee and immobile unless warrants are exercised against it. But—and here I suppose my point of view indicated above comes in—this does not seem to me an unusual power for a corporation, but one naturally to be exercised in the light of the general good of all the stockholders, not merely those holding warrants, with the reduction in the basic purchase price serving as a preventive of unfairness to any of the participants.

Elsewhere I have thought we have tended to overvalue the perpetual effect of stock warrants, Securities and Exchange Comm. v. Leventritt, 2 Cir., 179 F.2d 615, certiorari granted, U.S., 71 S.Ct. 62, and have agreed more with the contrary view expressed in In re Commonwealth & Southern Corp., 3 Cir., 184 F.2d 81. But here we have further the express clause of sec. 10 providing for the notice with a definite purpose "to the end that, during such pe-

riod of sixty days," the warrant holders may purchase stock and "be entitled, *in respect of shares so purchased* to all of the rights of the other holders of similar stock of the Corporation." (Italics supplied.) Of course they know already that they are entitled to such rights just as soon as they exercise their warrants—except to the extent that this clause may be given some operative effect. So why should the draftsmen have painted the lily further unless the sixty days was intended as a definite period for the taking of some action? I would affirm.